And we'll move to our final case this morning, United States v. Khalil Jackson. And for this case we have Ms. Christensen on Zoom, and Mr. Holler is here in the courtroom. I apologize. It wasn't letting me unmute or start my video. All right. Now I have to be able to hear everybody. Great. Take a breath. All right. I'm all good. You can proceed whenever you're ready. Thank you. Thank you, Your Honors. May it please the court. My name is Joanna Christensen, and I represent the appellant Khalil Jackson in this matter. Mr. Jackson made a clear and unambiguous request for counsel, which was acknowledged by the officer who was interrogating him. But the officer continued to ask him statements designed to elicit a response. Three times Mr. Jackson said, I'd just rather have a lawyer. I'd rather talk to a lawyer. I want a lawyer. Only the third time did Williams finally stop asking him additional questions or making statements that would elicit a response from him. Of course, the inquiry into whether this was a clear and unambiguous statement is an objective one. But there must be a present clear expression of a desire for a lawyer. And the word rather means a desire for one thing over another. So when the officer says, do you want to talk to me? Mr. Jackson says, I'd rather have a lawyer. I'd rather talk to a lawyer. That shows his clear desire to speak with a lawyer rather than speaking to the officer. The government has argued in its response brief that this is a subjective inquiry, what Officer Williams believed. Because Officer Williams said that I thought he wanted he asked for a lawyer. He says during the interview, well, you asked for a lawyer. And then during his testimony, acknowledged again that he had asked for a lawyer. In Oregon v. Bradshaw, the Supreme Court specifically found that the officer's interpretation of the request could be considered when the court makes a decision whether it was an objective request for counsel. So in the whole circumstances of the interview, it shows that Mr. Jackson expressed a clear desire for a lawyer. The interrogation should have stopped, but it didn't. Just like in Wisinger, the government kept, I'm sorry, the officer kept asking questions designed to elicit incriminating responses. As I heard the conversation, in response to that, I'd rather have a lawyer, I thought the officer stopped asking questions. But then Mr. Jackson continued the conversation. He was asking questions of the officer. And in essence, we're more in the reinitiation branch of Miranda case law than the ambiguity branch of the case law. Well, I think so. The first time William says, okay, in the middle of Mr. Jackson asking for a lawyer. And then Mr. Jackson says, you know, you guys are taking me to jail. What more can I do to help myself? And at that point, they have a conversation about jail. But during that, you know, Officer Williams is saying, once a complaint is made, I have to investigate it. There are two sides to every story. Those questions come from Williams, not from Jackson himself. He's got a question about the search warrant. But Williams keeps redirecting him to make those incriminating statements. Well, what are you relying on most specifically? Because as I say, Jackson is asking questions, the officer is answering them. And that doesn't sound like a violation of Miranda or Edwards to me. So the statements, it's my job to prove you're innocent as much as it is to prove you're guilty. And then again, this is after the final request for a lawyer, which is, yeah, the digital evidence sucks. But he's like, there are two sides to every story. He says that twice. And those are definitely the statements that would prod or cajole a defendant into making the statements to prove that he's got the right side of the story. I think from the very beginning, the strategy was for Officer Williams to get Mr. Jackson to talk and to make these incriminating statements about his relationship with Jane Doe and the involvement in the offense. And Mr. Jackson certainly is not silent. But he's responding in a way because Officer Williams has told him, listen, it's my job to listen to you. You don't want to talk to me? I got to know your side of the story. That's the type of cajoling that Edwards is specifically concerned about. And I think more importantly, to the government's point about harmless error, is that the four key pieces of information that he admitted are his knowledge of Jane Doe's age, his admission of the cell phone number he used, the email address he used, and the Facebook profiles he used. Now, of course, that evidence likely would have come in anyway. It sounds as if Williams at least has some of that information during the interview. But it is a far greater impact on the jury when they hear an officer testify, the defendant said to me, yes, I knew that she was 17. Yes, this was the email and cell phone that I used in the Facebook profile. So the error was not harmless in that way. And the officer showed the strategy from the very beginning when he says at the very beginning, I'm going to advise you of your rights. And he says that several times. But I want to talk to you. You know, you can't lie to me. We're federal officers. But I want to talk to you. And it's not until much later on that he actually reads the Miranda rights. That shows the strategy of Officer Williams to override Mr. Jackson's request for a lawyer several times in this case. So again... I love that defense on the harmlessness point. I thought the defense here was lack of coercion. It was certainly lack of coercion. That was the primary defense. But of course, harmlessness is not necessarily directed toward what the defense is. It's about whether the evidence is overwhelming. And weighing that evidence, this evidence would have been significant to the jury. Against the 46,000 text messages, hundreds of online prostitution advertisements, and the nude and suggestive pictures of Jane Doe on the phone? Plus all the victim testimony? That's a lot of evidence as far as I'm concerned. That's significant evidence, yes, Your Honor. But the admissions of a defendant are significant to a jury. Even if they're told that the defendant has the right to remain silent. When an officer testifies that the defendant has made these admissions, that's going to definitely weigh on the jury's mind. Heavily. Despite the other evidence. So, unless the court has further questions, I see I'm into my rebuttal. I shall reserve that time. That's fine. Mr. Haller. Thank you. Good morning, Your Honors, and may it please the court. The district court correctly concluded that Mr. Jackson did not clearly and unambiguously invoke his right to counsel prior to making the statements admitted at trial. Or that in the alternative, Jackson reinitiated. And it further did not abuse its discretion in denying Jackson's limiting instruction. To the extent the court perceives error in either of these regards, that error was harmless. Mr. Haller, what about the 3041 mark, the statement, I want a lawyer now, and any statements after that? Well, I want a lawyer is clear and unequivocal. I don't think there's any dispute about that. But there were no admissions made after that, and regardless, none of that was admitted. The tape itself was not admitted at trial. And, in fact, the only admissions, I mean, the entire scope of testimony in this four-day trial is on pages 384 and 385 on the trial transcript. And, I mean, I mostly agree with Ms. Christensen, although I think there are only three things. There's no testimony about Facebook profiles in there. So it's just her age, the cell phone number, and the e-mail. And I don't, I mean, the cell phone and the e-mail I think we can really set aside because the phones are seized from him. His picture, his social security number, and all of these thousands and thousands of text messages are on the phone. So, I mean, I don't know whether he wanted to admit it or not. There was not going to be anybody who was going to dispute that it was his cell phone, particularly when he's calling from jail asking his girlfriend to try to get that phone and break it in half. So we're left with an argument that this wasn't harmless because he admitted that he knew that she was 17. He'd been in a year-long relationship with this woman. He'd taken her to Grand Rapids to meet his family for Thanksgiving. She was in high school. Her friends knew how old she was. And she and her grandfather both testified that they told the defendant how old he was. So I don't, I mean, the court I think could resolve this on harmless error alone if it didn't want to get into the grand implications here. But that said, Your Honor, I believe that I'd just have a, rather have a lawyer. I'd rather talk to a lawyer. You guys are going to take me to jail. What is there more I can do to help myself? I believe in context that that's ambiguous. It could well mean what my opponent says it means. But it could also mean what I think it means here, which is, look, I don't want to give you guys the information. I'd really prefer if I could have a lawyer here. But I want to talk to you. I want to get information out from you. That's what he seems to want, and he gets a lot of information, including that a lot of the evidence is on the phones, which he then uses to call his girlfriend and try to get the phones back to break them in half. Mr. Haller, I've got to tell you, I'm pretty troubled by the idea that I'd rather have a lawyer is not enough. I understand you're arguing larger context there. If we were to, well, I don't see a constitutional difference, frankly, between give me a lawyer, I want a lawyer, I would like a lawyer, please, or I'd rather have a lawyer. Those all sound to me like varying degrees of politeness in requesting a lawyer. But do you see any pitfalls for us if we were to say, look, that's clear enough. I'd rather have a lawyer than do anything else is the implicit part of that, but then say that Mr. Jackson reinitiated and continued the conversation. Well, Your Honor, I mean, look, I think I'd rather have a lawyer is definitely close to the line, but if I can't afford a lawyer, but is there any way I can get one? Doesn't count, which it doesn't under Lord. I might want to talk to a lawyer. Sproul said doesn't count. Yeah, I do want a lawyer, but Hampton said doesn't count. There's a lot of things that are close to the line, and at a certain point, I don't know that we want to be super parsing grammar. So, I mean, I suppose the court could duck that question and say regardless of whether it counts, it's close to the line, then the government might want to be careful about this, but we're not deciding. But by that token, I think reinitiation is pretty clear here. He is continually asking questions, and the key point is that Officer Williams is stopping. He's saying, okay, and he's letting the defendant go, and the defendant asks a whole bunch of questions, and Officer Williams isn't asking any questions. The defendant's saying, look, I want to know about why I'm going to jail. I want to know about what this inquiry is related to. I want to know this. I want to know this, and I want to know this. And finally, Officer Williams cuts it off and says, look, I'm not going to talk to you anymore unless you want to talk to me, and we're going to have an interrogation, and then he says, yeah, I want to talk to you, and then he reads in the Miranda right. So I think that this is clearer as a reinitiation than it is as a not clear and unambiguous statement, but I think looking at this court's precedence and looking at all of the things that fall on the ambiguous ambiguity line, I do think this fits comfortably over there. The court may disagree with that, but I just think that there are a lot of things. It's not a clear and present request for a lawyer that can't be construed any other way, and I think it can be construed the way it was construed here, and Officer Williams, I think, to his credit, basically says, look, I didn't know what he wanted, and I was trying to find out, and he kept asking me questions, and this goes on and on and on, and so I asked him, tell me what you want. You can get into the exact thing, but they go on for several pages, and then he finally says, look, if you want to talk to me and explain your side, fine. If you want an attorney, that's fine, too, and he responds, of course I want to talk to you. So at that point, he can read in the Miranda warnings and then proceed with the interrogation, where, again, all we get is his name, he knows how old she is, and his email and cell phone. Do we have a reliable transcript in the record of that tape? I listened to it, and it's pretty tough. There is no transcript was admitted at the district court level, and so I think Ms. Christensen and I in the brief have largely agreed on the parts that at least we disputed. I mean, I'm sure if the court wanted to order one, we could produce one, but there is not one in the record, and so we didn't try to produce one in the appeal. As I said before, I do think that Inier was harmless. I think the only viable defense here was that she wasn't forced. I mean, that obviously didn't work, but I think the only defense on the record that any reasonable defense attorney would pursue here was the claim that she did this of her own free will, and that really relies on her, and she was believed by the jury, and that doesn't really have anything to do with his statements. And the thousands of text messages, of course, showed that she was engaged in this prostitution, that he was engaged in it right along with her, and it makes pretty clear that he knew her age. I mean, they put a—I forget exactly how old the text messages say she was, but far older than she actually was, which the expert witnesses testified as common. You never want the customers to believe that they might be with a minor. So there wasn't really any discussion on the limiting instruction issue, but I would just point out that it's very common to charge multiple offenses, and we don't typically tell the jury, you know, this is the count five evidence, don't consider it, et cetera. So he did—the limiting instruction that he got is the same limiting instruction every juror gets that's part of this court's pattern instructions. Do not consider the fact that he was convicted that you're convicting or quitting on count one and considering the other counts. It's the standard pattern instruction, and no more than that was necessary here. My question is really for Ms. Christensen, but I'll ask it of you, which is I don't see how— I'm not aware of precedent where we try to parse relevance out count by count and item of evidence by item of evidence or witness by witness. But even if we tried to, I can't imagine how a district judge would do that before final instructions at the very least. You know, the judge doesn't know what's coming. I agree, Your Honor. As we said in the brief, typically if counts are joined together, they're interrelated. So there's going to be some spillover and some overlap. If the defense believes before trial that it's just going to be impossible, you don't want the jury essentially to hear evidence about one count in relation to another, the remedy is Rule 14. I realize Rule 14 is rarely invoked, but in an extreme case, that, I believe, it would be the remedy. If something came up during trial where the court really thought that there was going to be some kind of spillover or overlap that was really going to cause a problem for the jury, I think that could be dealt with in limiting instructions. I just don't see that here. There is relevance. It isn't character. I acknowledge that. But that wasn't said in front of the jury. And so there were plenty of valid reasons why the jury would want to consider all of this together. And beyond that, I mean, look, the concern in 404B is that the jury is going to say, once a drug dealer, always a drug dealer. No juror is going to say, once somebody left bad messages on a phone machine, therefore they must have sexually exploited a minor. I suppose that could happen, but it's not something I think that we normally fear. And we normally think that this can be resolved through the generic standard limiting instruction. Consider the evidence on each count separately. The mere fact that you convicted or acquitted on one count should have no bearing on your decision on the other count. Pretty simple, pretty easy instruction, and frankly far easier than sometimes trying to get into convoluted limiting instructions that I query occasionally whether jurors understand. Well, the argument wasn't phrased or framed in 404B terms, as I understand it, for the limiting instruction that the evidence is admissible only for the cyberstalking count and is character evidence with respect to the other counts and must be limited accordingly. You can't consider this as to counts one through four, which isn't even a correct statement of law, and so therefore the court properly didn't give it. Thank you. That's the amount of time I'd ask that the judgment be affirmed. Thank you. Ms. Christensen. Yes, thank you, Your Honor. I think that for, I'm certainly not asking that the court parse out each piece of evidence with limiting instructions. It was this piece of evidence that I believe defense counsel was just asking for the court to repeat the original instructions about considering each count separately. It's not so much like always a drug dealer, you know, now a drug dealer. It's essentially violent, angry person leaving these messages means he's a violent, angry person, and that's the character reference that was trying to be avoided here. So back a little bit to the Miranda issue. The statement, I want a lawyer, the last one. What happens after that is relevant, not so much, I mean, obviously wasn't admitted, but it shows that Officer Williams had this strategy to continually cajole Mr. Jackson into talking to him, you know, very flippantly saying you can't dispute the digital evidence, ha, you know. And as far as the quotes go, I think that Mr. Holler and I are primarily in agreement with what is in our briefs. But again, there is no transcript if the court would like one. Again, we could certainly do one. Mr. Jackson does talk about his Facebook profile at 12 minutes 53 seconds. They discuss his Facebook, which is Drip Prince, and they talk about that a little bit, which is part of the evidence at trial. Mr. Williams, or I'm sorry, Officer Williams was not confused as to the nature of Mr. Jackson's request. He said, you asked for a lawyer, you know, do you want to talk to me or do you want a lawyer? And then when he testified, he said, I understood he asked for a lawyer. And Mr. Jackson does ask other questions, but primarily about, you know, they have a long discussion about bond in federal court, where he's going. And when he's being arrested, where he's being taken. So I think in the context of the entire discussion, Mr. Jackson clearly asked for a lawyer, and the admission of the evidence was not harmless. Thank you. Your honors. All right. Thank you very much. Our thanks to both counsel. The case is taken under advisement, and that concludes today's calendar. The court is in recess.